## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **DONALD W. HULSEY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 06-CV-194-PJC** |
| | ) | |
| **MICHAEL J. ASTRUE, Commissioner of the** | ) | |
| **Social Security Administration,[1]** | ) | |
| | ) | |
| **Defendant.** | ) | |

## ORDER

Claimant, Donald Hulsey ("Hulsey"), pursuant to 42 U.S.C. § 405(g), requests judicial

review of the decision of the Commissioner of the Social Security Administration

("Commissioner") denying Hulsey's application for Disability Insurance Benefits ("DIB") under

the Social Security Act.  In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have

consented to proceed before a United States Magistrate Judge.  Any appeal of this order will be

directly to the Tenth Circuit Court of Appeals.  Hulsey appeals the decision of the

Administrative Law Judge ("ALJ"), and asserts that the Commissioner erred because the ALJ

incorrectly determined that Hulsey was not disabled.  For the reasons discussed below, the Court

**AFFIRMS** the Commissioner's decision.

---

[1]      Pursuant to Fed. R. Civ. Pro. 25(d)(1), Michael J. Astrue, the current Commissioner of the Social Security Administration, is substituted for Jo Anne B. Barnhart as Defendant in this action.

1

**Claimant's Background**

Hulsey was born on December 26, 1951, and was 52 years old at the time of the ALJ's final decision. (R. 100, 118, 429).  He completed high school and trained at a vocational school in welding. (R. 128, 188, 408).  Hulsey's past work experience includes employment as an animal control officer, sales clerk, and mixer operator. (R. 123, 135-138, 183). On January 7, 2000, Hulsey injured himself on the job while working as an animal control officer for the City of Stroud and received a worker's compensation settlement in 2001. (R. 108-110, 409).   Hulsey alleges an inability to work beginning March 31, 2000 due to high blood pressure and pain in the low back, hip and leg. (R. 118, 122, 182, 409-411, 430-432).  Hulsey also alleges this pain contributes to his depression. (R. 143, 148, 153).

On February 28, 2000, Hulsey was examined by Gregory L. Mitchell, M.D. at the request of the worker's compensation claims adjustor. (R. 215-218).  Dr. Mitchell noted that Hulsey reported he first sought treatment for the pain by seeing chiropractor Gene F. Schumann, D.C. approximately 15-18 times. (R. 215).  Hulsey complained of sharp pain in the left side of his low back radiating into his left lateral leg; on a scale of zero to ten, he rated his pain an eight. (R. 216).  Dr. Mitchell recorded that Hulsey walked with a slight antalgic gait but required no assistive device and sat and arose cautiously from a chair.  *Id.*  On visual inspection, Dr. Mitchell did not find muscle atrophy or any spinal deformities, but he noted that "[p]alpation revealed moderate tenderness over the left paravertebral muscles and over the spinous processes of the lower three lumbar segments."  *Id.*  Dr. Mitchell noted that Hulsey's sensation and motor function were "normal and symmetric except for slight weakness of the quadriceps and hamstrings of the left leg."  *Id.*  Dr. Mitchell recorded several range of motion measurements for

2

the lumbar spine, including 25 degrees flexion, 5 degrees extension, 30 degrees right lateral flexion, 25 degrees left lateral flexion, 65 degrees right straight leg raise, and 50 degrees left straight leg raise. (R. 217).  Dr. Mitchell recommended that an MRI of Hulsey's lumbar spine be taken and that Hulsey avoid repetitious bending and stooping and restricted his lifting to less than 40 pounds.  *Id.*

From March 10, 2000 through January 29, 2001, Hulsey was treated by David G. Malone, M.D. having been referred by the worker's compensation claims adjustor. (R. 232-260). On initial physical examination, Dr. Malone found good motor strength, but he recorded that Hulsey's "[s]traight leg raising is positive on the left." (R. 252).  He noted that a reading of the radiographic studies indicated that there was degenerative disk disease of the lumbar spine and significant degenerative disk disease with anterior osteophytes at C4-5, 5-6, and 6-7 of the cervical spine. (R. 253).  Dr. Malone ordered an MRI of Hulsey's lumbar spine and recommended that Hulsey take Celebrex and continue working with his 40-pound lifting restriction.  *Id.*  Hulsey returned to Dr. Malone on April 3, 2000 and continued to report back pain, but noted that it was not as severe as it had previously been. (R. 248).  Dr. Malone reviewed the MRI results which showed significant advanced degenerative disc disease at the L1-2 level and a Schmorl's node "indenting the inferior endplate of L1," but no disc herniation. (R. 248, 367).  Based on the MRI results, Dr. Malone saw no indication for surgery and opined Hulsey had a soft tissue injury which should heal on its own with time.  (R. 248).

At his May 5, 2000 examination with Dr. Malone, Hulsey reported continuing low back pain but denied associated leg pain. (R. 246).  Hulsey indicated physical therapy had increased his pain and discomfort. *Id*.  Dr. Malone noted the MRI did not fully explain Hulsey's symptoms

3

and recommended additional testing. *Id*.  Dr. Malone placed a restriction on Hulsey limiting him

to light duty work, lifting no more than 15 pounds and no bending or twisting. (R. 359). On May

24, 2000, Hulsey continued to complain of pain in his left hip, but after reviewing a

myelogram/CT scan, Dr. Malone noted he was "at a loss to explain his symptoms currently." (R.

244).  Dr. Malone referred Hulsey to Dr. C. Scott Anthony, D.O. to undergo a lumbar discogram

to determine if Hulsey's pain was discogenic.  *Id*.

On June 8, 2000, Hulsey was examined by Dr. Anthony who noted "mild tenderness at

the lumbosacral junction, primarily on the left side . . . [with] a mild degree of pain that is

present in the sacroiliac joint region and a mild degree of positive Patrick's test on the left side."

(R. 225).  He also observed a negative straight leg raise test and a normal and symmetrical

neurological examination. *Id*.   Dr. Anthony performed a discogram and noted it was

"completely normal." (R. 226, 347-348).  Dr. Anthony indicated Hulsey's sacroiliac joint needed

to be ruled out as causing the pain and suggested a sacroiliac joint injection. (R. 226).  If this

could be ruled out, Dr. Anthony noted Hulsey could be a candidate for intradiscal electrothermic

therapy ("IDET"). *Id*.  Claimant returned to Dr. Malone on July 31, 2000, and Dr. Malone noted

there was still no diagnosis for Hulsey and deferred to Dr. Anthony's recommendation of a

sacroiliac joint injection. (R. 239).  Dr. Malone also concluded that Hulsey could work light

duty.  *Id*.        Before receiving a sacroiliac injection from Dr. Anthony, Hulsey requested a

second opinion from Karl N. Detwiler, M.D. (R. 219-222).  Hulsey was examined by Dr.

Detwiler on August 28, 2000.  *Id*.  Dr. Detwiler noted that Hulsey had normal ambulation, good

heel-toe tandem walking, a full range of motion without restriction in his low back, a negative

straight leg raise test, and no weakness in any muscle group. (R. 220).  Dr. Detwiler

4

recommended seeing an orthopedist to determine whether a sacroiliac joint injection would be of benefit, but did not believe Hulsey needed an IDET procedure. (R. 221).

On September 8, 2000, Hulsey was examined by Ronald G. Hood, M.D., an orthopedist, for evaluation of the sacroiliac joint. (R. 368). Dr. Hood noted Hulsey's reports of pain were "not consistent with the sacroiliac joint." *Id*. Dr. Hood reported he was "unable to substantiate any significant abnormality by physical exam in terms of [Hulsey's] SI joint." *Id*. Dr. Hood recommended Hulsey undergo a sacroiliac injection on his left hip and encouraged additional injections if the initial injection provided some relief in pain. (R. 369).

On September 27, 2000, Dr. Anthony administered a sacroiliac joint injection which provided Hulsey with a "considerable degree of benefit, in regards to his pain...[with] very little, if any, pain remaining..." (R. 223). Based on this, Dr. Anthony opined that the sacroiliac joint had been contributing to Hulsey's pain. *Id*. On November 3, 2000, Hulsey reported to Dr. Malone that the injection had provided pain relief for three days, but pain then recurred. (R. 236). Dr. Malone opined that the relief proved Hulsey had true sacroiliac joint pain and recommended Hulsey continue receiving sacroiliac joint injections and continue physical therapy. *Id*. Dr. Malone also restricted Hulsey to do no heavy lifting or twisting and undergo vocational retraining.[2] *Id.* Dr. Anthony then performed a second sacroiliac injection which again provided Hulsey with pain relief that lasted five days. (R. 234, 261). Although still tender, the physical therapy and injections seemed to help as Hulsey reported improvements on his December 8, 2000 visit with Dr. Malone. (R. 234). At that time, Dr. Malone opined that he was certain that Hulsey had sacroiliitis caused by the job-related injury. *Id*.

---

[2]     There is no record that Hulsey received vocational retraining.

On January 29, 2001, Dr. Malone reported that Hulsey had only transient improvements and had reached maximum medical improvement. (R. 232). Dr. Malone noted that Hulsey's "Patrick sign is positive on the left hip." *Id.* Dr. Malone determined that Hulsey needed to continue physical therapy as a home program, and he put Hulsey on a permanent 25-pound lifting restriction. *Id.* He opined Hulsey could work, but it "should be in a job where he can frequently change positions, [and] not have to do any heavy lifting and bending." *Id.*

Hulsey was seen by his treating physician Kenneth T. Darvin, M.D. ("Dr. Darvin") from August 28, 2000 through September 9, 2004. (R. 262-284, 313-320, 385-396). At Hulsey's initial visit, Dr. Darvin noted high blood pressure, for which Hulsey used to take Lopressor but stopped "because he thought it made him feel wired." (R. 273). Dr. Darvin prescribed Lisinopril for Hulsey's hypertension. *Id.* No mention is made of his back pain during this consultation nor on the next one (September 11, 2000) where Hulsey admits to feeling better overall. (R. 272-273). The first mention of back pain was at Hulsey's October 16, 2000 examination when he saw Dr. Darvin for a "swooshing" sound in his ears. (R. 271). Over the next several months, Dr. Darvin continued to see Hulsey for various ailments, including hypertension, anxiety, depression, and insomnia. (R. 265-270). During this time, Dr. Darvin did not record complaints concerning Hulsey's back, but did note that Hulsey reported feeling "good as gold" on his March 26, 2001 visit. (R. 265). On May 16, 2001, Hulsey complained of hemorrhoids and diarrhea for which Dr. Darvin recommended a hemorroidectomy, which was performed by Teodoro Agco Darvin, M.D., on May 21, 2001. (R. 264, 313-319).

On June 29, 2001, Hulsey reported pain in his sacroiliac region to Dr. Darvin who recommended he continue doing his floor exercises and stretching. (R. 263). In July 2001, Dr.

6

Darvin temporarily increased Hulsey's dosage for his pain reliever, Ultram. *Id*.  Hulsey repeated his complaints on his November 15, 2001 visit to Dr. Darvin who recorded a decreased range of motion. (R. 262).  On February 11, 2002, Dr. Darvin noted Hulsey was still experiencing pain in his left hip/sacroiliac region and reported no improvement after the sacroiliac joint injections. (R. 326).  Dr. Darvin also noted that Hulsey's hypertension was not being controlled and increased his Norvasc prescription. *Id*.

Subsequently, both Hulsey's low back pain and hypertension appeared more controlled as evidenced by his next several visits with Dr. Darvin. (R. 323-324).  After a June 4, 2002 visit, Dr. Darvin noted that Hulsey was "doing well" and was stable, despite an episode of back spasms three weeks earlier. (R. 324).  He confirmed this after a September 23, 2002 visit in recording that Hulsey's "pain has been controlled [with] Ultram" and noted that his hypertension was "borderline controlled." (R. 323).  Dr. Darvin reiterated it after a November 18, 2002 examination where Hulsey reported that most days he was "feeling fine" and Dr. Darvin noted that Hulsey's hypertension was stable. (R. 343).  After Hulsey's January 7, 2003 and April 16, 2003 visits, Dr. Darvin noted mild sacroiliac tenderness and an antalgic gait but recorded Hulsey's pain symptoms were stable and controlled with medication. (R. 341-342).  Dr. Darvin examined Hulsey three more times in 2003 with no changes. (R. 337-340).  However, after a March 4, 2004 visit, Dr. Darvin recorded that Ultram "made [Hulsey's] pain tolerable, but [did] not completely relieve the pain" and that Hulsey was trying to walk more but the pain made this difficult. (R. 385).  After a June 21, 2004 visit, Dr. Darvin recorded "[m]oderate left sacroiliac tenderness with a decreased range of motion of the lumbar spine." (R. 393).

On September 7, 2004, Dr. Darvin completed a Medical Source Statement ("MSS"). (R.

395-396).  In this, Dr. Darvin limited Hulsey's maximum capacity to frequently and occasionally lifting and/or carrying 10 pounds and his standing and/or walking capacity to three hours and his sitting capacity to five hours in an eight-hour workday with a continuous standing/walking limitation of 15 minutes and a continuous sitting limitation to one hour. (R. 395).  He also indicated Hulsey would need to lie down during the workday to manage pain. (R. 396).  He noted that Hulsey should never climb, balance, stoop, kneel, crouch, or crawl, should only occasionally reach or handle, but could frequently finger or feel.  *Id.*  He also noted that Hulsey had limited pushing and/or pulling capabilities, described as difficulty pushing a loaded grocery cart, and Hulsey was more susceptible to heat exhaustion/dehydration.  *Id.*

In conjunction with his worker's compensation suit, Hulsey was examined by Kenneth R. Trinidad, D.O. on October 30, 2000 and March 19, 2001. (R. 350-358).  Dr. Trinidad concluded that for worker's compensation purposes Hulsey was "temporarily totally disabled" from March 31, 2000 until March 19, 2001, and retained a "permanent partial impairment" of 33% to the whole man contributed from injuries to his "lumbar spine with associated radicular symptoms into the left hip," and 8% to the whole man contributed by injuries to the cervical spine.  (R. 354).  He reported that Hulsey's condition was stable and would require ongoing pain medication, and he concluded that Hulsey was limited to light duty work.  *Id.*

Hulsey was examined by consulting physician Paul M. Dichter, D.O. on December 18, 2001 and November 20, 2003. (R. 285-289, 370-375).  On December 18, 2001, Dr. Dichter observed that Hulsey's gait was "within normal limits, steady, stable and secure without assistive devices" and his "[m]uscle strength in all extremities [was] 5/5," but he noted that "[t]hroughout the examination [Hulsey had] marked restriction of motion and pain on the left sacroiliac joint

8

with any motion." (R. 286). He recorded pain and decreased range of motion in flexion and left bend in the lumbosacral spine but normal results in extension and right bend in the lumbosacral spine and all areas in the cervical spine. (R. 287). He also recorded negative straight leg raise tests both in sitting and lying. *Id.* He noted pain with movement and decreased range of motion in the back flexion, back lateral flexion (right and left) and tenderness in the left sacroiliac joint. (R. 288).

On November 20, 2003, Dr. Dichter found similar results and diagnosed "[l]umbar disc and degenerative disease with positive straight leg raising." (R. 371). He again noted pain and decreased range of motion in the back flexion and extension, back lateral flexion (right and left). (R. 372). He recorded pain and decreased range of motion in flexion, extension, and left and right bends in the lumbosacral spine, but normal results in all areas in the cervical spine. (R. 375). He also recorded negative straight leg raise tests in sitting and lying on the right leg but positive tests in sitting and lying on the left leg. *Id.*

A Physical Residual Functioning Capacity assessment ("RFC") was completed by agency physician Thurma Fiegel, M.D. on December 27, 2001, which was reviewed and affirmed as written on February 8, 2002 by Paul Vorschocher, M.D. (R. 290-298). Dr. Fiegel completed another RFC on January 4, 2004. (R. 376-384). In both RFC assessments, the physicians concluded that Hulsey was found able to occasionally lift 50 pounds, frequently lift 25 pounds, stand or walk about six hours in an eight hour workday, sit for about six hours during an eight hour workday, and push or pull an unlimited amount. (R. 292, 377). The RFC assessments also found Hulsey had frequent postural limitations for climbing, balancing, kneeling, crouching, and crawling and an occasional postural limitation for stooping. (R. 293, 378). However, neither

RFC assessment found manipulative, visual, communicative, or environmental limitations. (R. 294-295, 379-380).

A Psychiatric Review Technique was completed by agency psychologist Burnard L. Pearce, Ph.D. on February 8, 2002. (R. 299-312). Dr. Pearce found that Hulsey was depressed but that this mental impairment was not severe. (R. 299, 311).

**Procedural History**

On October 19, 2001, Hulsey protectively filed for DIB under Title II, 42 U.S.C. § 401 *et seq.*, alleging inability to work beginning March 31, 2000. (R. 99-102, 121-130). Hulsey's application for benefits was denied in its entirety initially and on reconsideration. (R. 34-35, 45-48, 51-53). An administrative hearing before ALJ Kim Daniel Parrish was held December 3, 2002 in Oklahoma City, Oklahoma. (R. 405-423). By decision dated July 1, 2003, the ALJ found that Hulsey was not eligible for DIB payments at any time through the date of the decision. (R. 36-43). The Appeals Council granted review and on October 23, 2003, it remanded the case to the ALJ to make further findings and obtain more evidence.[3] (R. 71-74). A second hearing before ALJ Kim Parrish was held August 25, 2004 in Oklahoma City. (R. 424-443). By decision dated November 19, 2004, the ALJ again found that Hulsey was not eligible for DIB payments at any time through the date of the decision. (R. 17-26). On February 3, 2006, the Appeals Council denied review of the ALJ's findings in the second hearing. (R. 8-10). Thus, the November 19, 2004 decision of the ALJ represents the Commissioner's final decision for

---

[3]  On September 8, 2003, Hulsey filed a second application with the Social Security Administration. (R. 118-120, 181-190). There are some updates (*e.g.*, he had gotten married), but the second application contains basically the same information as the first. This application for benefits was also denied. (R. 44). In remanding the decision regarding the first application, the Appeals Council found that the second application was a duplicate claim and consolidated the claims for further consideration. (R. 74).

purposes of further appeal.  20 C.F.R. § 404.981.

**Social Security Law and Standard of Review**

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less that twelve months."  42 U.S.C. § 423(d)(1)(A).  A claimant is disabled under the Act "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. . . ."  42 U.S.C. § 423(d)(2)(A).  Social Security regulations implement a five-step sequential process to evaluate a disability claim.[4]  20 C.F.R. § 404.1520.

Judicial review of the commissioner's determination is limited in scope by 42 U.S.C. § 405(g).  This Court's review is limited to two inquiries: first, whether the decision was supported by substantial evidence, and second, whether the correct legal standards were applied.  *Hargis v. Sullivan*, 945 F.2d 1482, 1486 (10th Cir. 1991) (citation omitted).

"Substantial evidence is such relevant evidence as a reasonable mind might accept as

---

[4]  Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510.  Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities.  *See* 20 C.F.R. § 404.1520(c).  If the claimant is engaged in substantial gainful activity (Step One), or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied.  At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1 ("the Listings").  A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry.  If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the RFC to perform his past relevant work.  If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education, work experience, and RFC, can perform.  *See Dikeman v. Halter*, 245 F.3d 1182, 1184 (10th Cir. 2001).  Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work.  20 C.F.R. § 404.1520.

11

adequate to support a conclusion." *White v. Barnhart*, 287 F.3d 903, 905 (10th Cir. 2001)

(citation omitted).  In reviewing the decision of the Commissioner, the court "may neither

reweigh the evidence nor substitute [its] judgment for that of the agency." *Id.* (citation omitted).

Nevertheless, the court examines "the record as a whole, including whatever in the record fairly

detracts from the weight of the Secretary's decision and, on that basis, determines if the

substantiality of the evidence test has been met." *Casias v. Secretary of Health & Human Servs.*,

933 F.2d 799, 800-801 (10th Cir. 1991) (citation omitted).

## Decision of the Administrative Law Judge

The ALJ made the decision at Step Four of the evaluation process.  At Step One, the ALJ

questioned whether Hulsey had been engaged in substantial gainful activity after the alleged

onset date because his earnings for 2000 were almost as much as the previous two years, as well

as receiving income in 2001. (R. 18, 25).  The ALJ determined at Step Two that Hulsey's

impairments, specifically degenerative disc disease, hypertension, and  hemorrhoids were singly

or in combination "severe," but at Step Three the ALJ concluded that they did not meet or equal

the severity of any impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1 ("the Listings"). (R.

19, 25).

The ALJ, after reviewing the record, determined that Hulsey  "retains the residual

functional capacity to lift and/or carry 20 pounds occasionally and 10 pounds frequently; stand

and/or walk six to eight hours during an eight-hour workday; and sit six to eight hours during an

eight-hour workday." (R. 23).  Accepting the vocational expert's testimony using the RFC

assessment, at Step Four the ALJ concluded that Hulsey

> is able to perform his past relevant work as an animal treatment investigator
> (animal control officer), and although he would be unable to perform his past

relevant work as a retail sales clerk/stocker as previously performed by him, he would be able to perform most retail sales jobs, as such jobs are generally performed in the national economy (20 CFR § 404.1565).

(R. 26).  In the alternative, at Step Five, the ALJ determined Hulsey was currently an "individual closely approaching advanced age,"  had a high school education, and had garnered "transferable skills from semi-skilled work previously performed as a salesclerk." (R. 24, 26).   Applying the Medical-Vocational Rules 202.07[5] and/or 202.15, 20 C.F.R. §404, subpt. P, App. 2, ("grids"),[6] the ALJ found that Hulsey was "not disabled."  In addition, the ALJ found that Hulsey could perform "other retail clerk jobs of a light, semiskilled nature, which did not involve stocking, such as general merchandise sales clerk, comprising approximately or [sic] 8,200 jobs regionally and 87,200 jobs in the national economy."  (R. 25). Accordingly, the ALJ concluded that Hulsey was not disabled  under the Social Security Act at any time through the date of the decision. (R. 26).

## Review

Hulsey contends that the ALJ erred by failing (1) to properly evaluate medical evidence, (2) to determine Hulsey does not have the RFC to perform substantial gainful activity, and (3) to perform a proper credibility analysis.

### (1)        Evaluation of the Medical Evidence

---

[5]        Rule 202.15 applies to individuals who are closely approaching advanced age and Rule 202.07 of the grids pertains to individuals of advanced age.

[6]        The "grids" relate a claimant's age, education and job experience with his ability to engage in work in the national economy at various levels of exertion to determine a claimant's ability to work.  Once the ALJ determines a claimant's RFC, the ALJ may look to the grids to direct a determination of disability based on his vocational characteristics.  *Williams v. Bowen*, 844 F.2d 748, 752 (10th Cir.1988). "The grids offer a short-cut method for resolving disability questions whenever the claimant can perform a substantial majority of the work in the designated RFC category."  *Evans v. Chater*, 55 F.3d 530, 532 (10th Cir.1995).

Hulsey asserts that the ALJ did not give proper weight to the opinions of his treating physician, Dr. Darvin, especially the MSS, nor did the ALJ explain what weight he afforded them and the reasons for his determination.  In the MSS, Dr. Darvin set more restrictive limitations than the ALJ's ultimate RFC finding, and, with these limitations, the vocational expert ("VE") testified Hulsey would be unable to perform his past work and the other jobs the VE had identified.[7] (R. 395-396, 441-442).  Hulsey also contends that the ALJ had a duty to contact Dr. Darvin for clarification if the ALJ found that Dr. Darvin's opinions were not supported by the objective medical evidence.

Hulsey is correct that treating physicians' opinions are generally afforded more weight than other physicians' and that medical sources who treat the claimant for longer periods of time are usually afforded the most weight. 20 C.F.R. § 404.1527(d)(2).  However, in order for the ALJ to give a treating physician's opinion controlling weight, the ALJ must "find that a treating source's opinion on the issue(s) of the nature and severity of [the claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." *Id.*  Moreover,  "a treating physician's opinion is not dispositive on the ultimate issue of disability" because the final responsibility of determining disability rests with the Commissioner.  *White*, 287 F.3d at 907; *Castellano v. Secretary of Health & Human Servs.*, 26 F.3d 1027, 1029 (10th Cir. 1994).

If the ALJ decides not to give the treating physician's opinion controlling weight, he

---

[7]    The vocational expert ("VE") testified that an individual with the same age, education, past relevant work experience, and RFC as Hulsey could perform Hulsey's past relevant work as an animal treatment investigator, listed as light and semi-skilled with a SVP of 3, and other sales jobs where he would not have to do the stocking, such as book sales (light with SVP of 4) of which 16,400 exists in the national economy and 1,300 regionally, and general merchandise sales clerk (light with SVP of 3) of which 87,000 exists in the national economy and 8,200 regionally. (R. 440-441).

must consider the following factors to determine how much weight to give the opinion:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which the opinion is rendered; (6) other facts brought to the ALJ's attention which tend to support or contradict the opinion.

*Goatcher v. U.S. Dept. of Health & Human Servs*, 52 F.3d 288, 290 (citing 20 C.F.R. § 404.1527(d)).  After considering these factors, the "ALJ must give good reasons in [his]... decision for the weight he ultimately assigns the opinion." *Watkins v. Barnhart*, 350 F.3d 1297, 1301 (10th Cir. 2003) (quotations omitted).

In his MSS, Dr. Darvin opined that Hulsey had the ability to lift or carry only 10 pounds, stand or walk only three hours in an eight-hour workday, sit only five hours in an eight-hour workday, stand or walk continuously for only fifteen minutes and sit continuously for only one hour. (R. 395).  When asked to describe "the principal, clinical and laboratory findings and symptoms or allegations (including pain) from which the impairment-related capacities and limitations [Dr. Darvin listed] were concluded," Dr. Darvin provided no explanation. *Id*.  In weighing Dr. Darvin's opinion, the ALJ found that Dr. Darvin's "medical records . . . reflect few if any objective findings to support the claimant's subjective complaints":

> On October 31, 2003, Dr. Darvin reported only that the claimant had moderate sacroiliac tenderness bilaterally with slightly decreased range of motion (Exhibit 14F).  Moreover, the claimant reportedly reported that his sacroiliac pain had been controlled with Ultram, and Dr. Darvin's medical records do not reflected [sic] any significant difficulties with medication side effects.  On March 4, 2004, Dr. Darvin reported, "Moderate sacroiliac tenderness and upper mid lumbar spinous tenderness," and he commented, "No acute distress.  He walks with an antalgic gait (Exhibit 22F and 23F).  On June 21, 2004, Dr. Darvin again reported "moderate sacroiliac tenderness" as well as decreased range of motion of the lumbar spine, but he did not mention antalgic gait, although he did mention that

15

the claimant was continuing to take Ultram.  Unfortunately, Dr. Darvin, as in his other medical records, failed to include any specific objective clinical findings, such as degree of limitation of motion, and there is no report of positive straight leg raising or of any other neurologic deficits.

(R. 21).

Although the ALJ does not explicitly state what weight he gave Dr. Darvin's opinion, implicit in his discussion is the finding that Dr. Darvin's MSS on Hulsey's functional limitations was not entitled to controlling weight because Dr. Darvin "failed to include any specific objective clinical findings, such as degree of limitation of motion, and there is no report of positive straight leg raising or of any other neurologic deficits." (R. 21).  *See   Causey v. Barnhart*, 109 Fed.Appx. 375, 378 (10th Cir. 2004)(RFC inconsistent with treating physician's opinion implies ALJ finding the opinion is not entitled to controlling weight).  The ALJ can properly reject a treating physician's restrictions when the treating physician's "assessment was based on [the claimant's] subjective assertions rather than objective medical evidence." *White*, 287 F.3d at 907.  Further, although the ALJ "could have been more meticulous in following the established Tenth Circuit framework for evaluating a treating physician's opinion," the decision provides "legally sufficient and factually supported reasons for rejecting" Dr. Darvin's opinion. *Causey*, 109 Fed.Appx. at 378.  While the ALJ did not specifically state how many years Dr. Darvin had treated Hulsey, it is clear from the supporting facts that the ALJ was aware of the frequency and length of Dr. Darvin's treatment and the nature and extent of the treatment relationship.  Further, throughout his detailed decision, the ALJ discussed and compared Dr. Darvin's findings with those of the other treating physicians as well as the consulting examiner and the agency physicians.  The ALJ noted that the objective diagnostic testing performed by treating neurosurgeon, Dr. Malone, showed no neurological basis for Hulsey's back pain and Dr.

16

Malone commented that he was at a loss to explain Hulsey's symptoms. (R. 20).  The ALJ also cited the finding of consulting examiner Dr. Dichter who "reported that the claimant's gait was within normal limits, steady, stable and secure without assistive devices" and of medical expert Dr. McCown who observed that Hulsey's "neurological exam was normal and that many of the doctors had been unable to say why they think he had been hurting." (R. 22).  Additionally, the ALJ observed that Dr. Darvin's notes are not always consistent; for example, Dr. Darvin recorded an antalgic gait on February 11, 2002 and March 4, 2004 but did not mention it in his notes from December 18, 2001, October 31, 2003, November 20, 2003, or June 21, 2004.  (R. 22).  Although "the ALJ could have been more meticulous in following the established Tenth Circuit framework for evaluating a treating physician's opinion," the Court finds that his decision "provides legally sufficient and factually supported reasons" for rejecting Dr. Darvin's opinion. *Causey*, 109 Fed.Appx. at 378.

Claimant argues that even if Dr. Darvin's opinions were unsupported, the ALJ had a duty to re-contact him for clarification.  It is true, as the plaintiff argues, that an ALJ has a basic duty in every social security case "to ensure that an adequate record is developed during the disability hearing consistent with the issues raised."  *Henrie v. U.S. Dept. of Health & Human Servs.*, 13 F.3d 359, 360-61 (10th Cir. 1993).  Although the duty may be greater when the claimant is not represented, the duty exists even when counsel is present. *Id* at 361.  The duty is one of inquiry, ensuring that the ALJ is informed about the facts relevant to his decision and the claimant's version of those facts.  *Id.*; *Dixon v. Heckler*, 811 F.2d 506, 510 (10th Cir. 1987).  The ALJ also has a duty to re-contact a medical source "[w]hen the evidence [the ALJ] receive[s] from [the claimant's] treating physician . . . is inadequate for [the ALJ] to determine whether [the claimant

17

is] disabled. . . ."  20 C.F.R. § 404.1512(e).  The Tenth Circuit clarified that "it is not the rejection of the treating physician's opinion that triggers the duty to re-contact the physician; rather it is the inadequacy of the 'evidence' the ALJ 'receive[s] from [the claimant's] treating physician' that triggers the duty."  *White*, 287 F.3d at 908 (quoting from 20 C.F.R. § 416.912(e)).

The Court finds that the ALJ did not err by failing to re-contact Dr. Darvin to clarify his opinions.  The ALJ discussed at length the findings of Dr. Darvin. (R. 21).  There is no indication the ALJ found the information inadequate for consideration.  Rather, the ALJ determined that Dr. Darvin's conclusions were insufficiently supported by objective findings and appeared to be based on Hulsey's subjective allegations of pain.  *Id.*; *see White*, 287 F.3d at 908. Further, the record provides substantial evidence for this determination.  Dr. Malone  assessed Hulsey with a permanent 25-pound lifting limitation, a less restrictive assessment than the ALJ's RFC and Dr. McCown testified that his review of the record revealed no bases for any work restrictions.  Given that the ALJ rejected Dr. Darvin's opinion because it was not supported by objective evidence and not because the opinion was incomplete or in need of clarification, the Court finds that the ALJ was not obligated to re-contact Dr. Darvin.  *Sandoval v. Barnhart*, 197 Fed.Appx. 801, 806 (10th Cir. 2006) (Because the ALJ did not find the treating physician's opinion incomplete or in need of clarification, but simply inconsistent with objective medical findings, we conclude "that the ALJ was not obligated to recontact" the treating physician.).

**(2)      RFC Determination**

Hulsey contends that the ALJ erred in determining that Hulsey had the RFC to engage in substantial gainful work.  Specifically, he claims that "[t]he record does not contain substantial evidence supporting the ALJ's finding that Hulsey retained the exertional and nonexertional

18

ability to perform light work on a full-time basis." *Plaintiff's Brief,* p. 7.  He supports this argument mainly with the limitations found by Dr. Darvin.  He further argues that the ALJ did not adequately link the evidence to the RFC finding.

Residual functional capacity is what an individual can still do despite his impairment(s). 20 C.F.R. § 404.1545(a).

> It is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to perform work-related physical and mental activities.

SSR 96-9p at *1.  RFC is the "individual's maximum remaining ability to perform sustained work on a regular and continuing basis; i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule.  It is not the least an individual can do, but the most, based on all of the information in the case record." *Id*. at *2.  In this case, the ALJ found that Hulsey retains the RFC "to lift and/or carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk six to eight hours during an eight-hour workday; and sit six to eight hours during an eight-hour workday."  (R. 23).

As discussed above, the ALJ's implicit decision to reject Dr. Darvin's MSS was supported by substantial evidence.  Moreover, in weighing the opinions of other physicians, the ALJ rejected the less restrictive RFC assessments completed by the agency physicians who opined that Hulsey was capable of performing medium work activity as well as the opinion of the medical expert Dr. McCown who testified that he "couldn't really find anything [in the record] that would say that there would need to be a restriction" at all. (R. 428, 21-22 ). After a very thorough analysis the ALJ concluded that Hulsey had the RFC for light work activity citing substantial evidence for this determination. (R. 19-23).  Because the ALJ properly rejected Dr. Darvin's MSS and adequately discussed his RFC determination, the Court finds no error.

19

**(3)**     **Claimant's Credibility**

Finally, Hulsey argues that the ALJ did not provide an adequate analysis in his credibility

determination as he did not sufficiently cite to the medical evidence or consider the factors

provided in 20 C.F.R. § 404.1529 and the record as a whole when evaluating Hulsey's subjective

pain allegations.

Credibility determinations by the trier of fact are given great deference. *Hamilton v.*

*Secretary of Health & Human Servs.,* 961 F.2d 1495, 1499 (10th Cir. 1992). The ALJ is

responsible for determining credibility and resolving conflicts in medical testimony. *See, e.g.,*

*Tillery v. Schweiker*, 713 F.2d 601, 603 (10th Cir. 1983). In analyzing the evidence of allegedly

disabling pain, the ALJ "must consider (1) whether Claimant established a pain-producing

impairment by objective medical evidence; (2) if so, whether there is a 'loose nexus' between the

proven impairment and the Claimant's subjective allegations of pain; and (3) if so, whether

considering all the evidence, both objective and subjective, Claimant's pain is in fact disabling."

*Kepler v. Chater*, 68 F.3d 387, 390 (10th Cir. 1995) (quotation omitted). A conclusory paragraph

is not sufficient to discredit a claimant's claim of pain. The ALJ must make specific findings of

fact, so that the reviewing court does not have to speculate as to the reasons for the ALJ's

decisions as to a claimant's credibility. *Id.* at 391; SSR 96-7p at *2 (When determining

credibility, the ALJ is to set forth "specific reasons for the finding on credibility, supported by the

evidence in the case record.").

The factors an ALJ should consider when evaluating symptoms such as pain include "all

of the available evidence, including [the claimant's] history, the signs and laboratory findings,

and statements from [the claimant], [the claimant's] treating or nontreating source, or other

20

persons about how [the claimant's] symptoms affect [him or her]."  20 C.F.R. § 404.1529(c)(1).

The ALJ should also consider a claimant's daily activities; the location, duration, frequency, and

intensity of the claimant's pain; precipitating and aggravating factors; the type, dosage,

effectiveness, and side effects of any medications; types of treatment undergone; any other

measures taken to alleviate the pain; and any other factors.  20 C.F.R. § 404.1529(c)(3)(I)-(vii);

*Kepler*, 68 F.3d at 390-91; SSR 96-7p.  If the ALJ sets forth the specific evidence on which he

relies in evaluating a claimant's credibility, he does not have to recite the evidence factor by

factor. *White*, 287 F.3d at 909.

   The ALJ considered Hulsey's subjective complaints of pain and concluded that Hulsey's

allegations were exaggerated to the extent that he would be "unable to perform substantially a full

range of light work activity." (R. 23).  The ALJ examined Hulsey's medical records and observed

him and listened to his testimony at two separate hearings and concluded that Hulsey's

"statements concerning his impairments and their impact on his ability to work are not supported

by the preponderance of the medical evidence and otherwise are not wholly credible." (R. 23).

This Court finds no error in this determination.

   The ALJ looked specifically at the objective medical findings of the treating, consulting

and reviewing physicians, as well as the testimony of the medical expert, Dr. McCown, in

assessing Hulsey's pain allegations.  The ALJ determined that "the degree of symptoms alleged

by [Hulsey] are not well supported" because while Hulsey does suffer from degenerative disc

disease, "all of the objective laboratory diagnostic findings of record indicate the absence of any

significant nerve root impingement."  (R. 22).   The ALJ noted that while Hulsey sometimes

walked with an "antalgic gait," this was not always the case as Dr. Darvin "did not mention

antalgic gait" after reporting "moderate sacroiliac tenderness," decreased range of motion, and continued use of Ultram and Dr. Dichter, the consulting examiner, recorded that Hulsey's "gait was within normal limits, steady, stable, and secure without assistive devices." *Id.* The ALJ also cited Dr. Darvin's medical records as generally indicating that Hulsey's "pain is susceptible to control with Ultram, with no indication of significant medication side effects." *Id.* Also, Dr. McCown testified that he "could not find anything in the record that would 'say that there would need to be a work restriction'" and that Dr. McCown's findings were "inconsistent with the allegations of the claimant." *Id.* Finally, the ALJ found that although Hulsey testified that he is able to lift only a gallon, and that much only with pain, Dr. Malone, neurosurgeon, indicated that the claimant required a lifting restriction of no less than 25 pounds.

The ALJ also considered Hulsey's daily activities as Hulsey reported them. The ALJ considered that

> on an average day, [Hulsey] would get dressed, cook breakfast and lay in the floor with his son. [Hulsey] also stated that he washed dishes, washed and folded clothes, and made the bed. [Hulsey] added that he got out and visited neighbors, sat outside, and drove on short errands around town. . . . [Hulsey also] indicated that he was active in church. . . and that he went to horse sales in nearby towns.

(R. 23)(emphasis not retained).

The ALJ then considered Hulsey's inconsistent statements. The ALJ noted that while Hulsey denied doing any shopping, that was "somewhat inconsistent with his statement that he drove on short errands around town" and directly contradictory to Hulsey's statement in the Disability Supplemental Interview Outline where he admitted to doing some shopping. (R. 23). The ALJ also noted that Hulsey first denied being active in church, clubs, or other groups, but subsequently "indicated that he was active in church." *Id.* (emphasis in original). Furthermore,

22

the ALJ observed that Hulsey originally "stated that he was able to drive on unfamiliar routes and that he went to horse sales in nearby towns," but he later claimed when asked about "driving on unfamiliar routes, 'I don't drive out of town, so I don't get too far.'"  *Id.*

For these stated reasons, the ALJ concluded that Hulsey "has exaggerated his allegations of pain and other symptoms to the extent that he contends that he is unable to perform substantially a full range of light work activity." (R. 23).  The Court finds the ALJ's credibility determination is supported by substantial evidence.

For the reasons stated above, the Commissioner's decision is **AFFIRMED**.

Dated this 17th day of August, 2007.

Paul J. Cleary
United States Magistrate Judge